UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X
                                 :

ZAQUANNA ALBERT, et al.,             :

                               :           17-cv-3957-ARR-SMG

                 Plaintiffs,        :

                               :

      -against-                   :

                               :          <u>OPINION & ORDER</u>

CITY OF NEW YORK, et al.,          :

                               :

                Defendants.     :

                               :
-------------------------------------------------------------- X

ROSS, United States District Judge:

On July 4, 2016, Delrawn Small was fatally shot by Wayne Isaacs, a New York City police officer. At the time of Small's death, Zaquanna Albert and her two minor children, Z.I. and Z.S. (collectively, "plaintiffs"), were passengers in Small's vehicle. In this lawsuit, they seek to recover damages for constitutional and state-law injuries they allege that they suffered during and in the immediate aftermath of Small's shooting. Two groups of defendants have filed motions to dismiss plaintiffs' fourth amended complaint: (1) the City defendants, which includes the City of New York ("the City") and several police officers who investigated the shooting and questioned plaintiffs at a nearby precinct, and (2) Isaacs, who is represented by private counsel. For the reasons set forth below, both motions are granted in part and denied in part.

## BACKGROUND

At approximately 11:45 P.M. on July 3, 2016, plaintiffs were driving home from a party with Small. *See* Fourth Am. Compl. ¶¶ 24–25, ECF No. 65 ("FAC").[1] In addition to Small, who

---

[1] I assume familiarity with the facts underlying this case, which are set forth in detail in my previous opinions in this case. *See Isaacs v. City of New York*, No. 17-cv-03957-ARR-SMG, 2019 WL 1208787 (E.D.N.Y. Mar. 13, 2019); *Albert v. City of New York*, No. 17-cv-3957-ARR-SMG, 2018 WL 5084824 (E.D.N.Y. Oct. 18, 2018). Accordingly, I refer only to those facts that are relevant to the instant motions.

1

was driving, there were three passengers in the car: Zaquanna Albert, Small's live-in partner, Z.I., Albert's 14-year-old daughter, and Z.S., Albert and Small's five-month-old son. *Id.* ¶¶ 23–25;[2] *see also id.* ¶ 58. Albert and Small were not married, but they had been living together "harmoniously and continuously" since March 2013, when Small moved in with Albert and her children. *Id.* ¶ 22. They met about two years before they started living together, *id.* ¶ 20, and they began dating in September 2012, *id.* ¶ 21.

Shortly before Small's car reached an intersection, Isaacs—who had recently completed his tour of duty at a nearby police precinct—cut off Small's car and "made eye contact with the passengers in [the] car, including Albert and Z.I." *Id.* ¶¶ 27–29. When Small reached the next traffic light, he got out of his car and approached Isaacs. *Id.* ¶¶ 31–32. As Small walked towards him, Isaacs shot Small three times. *Id.* ¶¶ 31–32, 35. Plaintiffs remained in the car, which was stopped approximately seven feet from Isaacs's car, giving them "a clear and unobstructed view" of the shooting. *Id.* ¶ 36. After the shooting, Albert, "fearing for her safety and the safety of her children," climbed into the driver's seat of Small's car and drove a few blocks away from the scene. *Id.* ¶ 37.

Approximately ten minutes later, Emergency Medical Technicians ("EMTs") and several members of the New York City Police Department ("NYPD"), including Detective Mark Scarlatelli, Sergeant George Tavares, Lieutenant Vitaly Zelikov, and police officer Rachel Corso, arrived at the scene. *Id.* ¶ 49. The NYPD officers interviewed Isaacs and Albert—who had returned to the scene at some point prior to their arrival—about the events leading up to the shooting. *Id.* ¶ 50. Though plaintiffs were never suspected of a crime, the officers "physically prevented Albert,

---

[2] Plaintiffs' filings sometimes refer to the five-month-old child as Z.I., *see* FAC ¶ 58, though he is most frequently referred to as Z.S., *see id.* ¶ 23; *see also* Pls.' City Opp'n 9, ECF No. 77 (arguing that Z.S., the five-month-old, "was old enough to suffer a verifiable injury"). For clarity and consistency, I refer to Albert's fourteen-year-old daughter as Z.I., and Albert and Small's five-month-old infant as Z.S.

Z.I., and Z.S. from aiding and comforting Mr. Small, intentionally interfering with their right of familial association." *Id.* ¶¶ 51–52. Plaintiffs were then removed from the scene and transported to an NYPD precinct. *Id.* ¶ 53. There, Z.I. and Albert were separated from one another and questioned again about the shooting by two NYPD detectives: Joseph Solomon and Paul Perodin. *Id.* ¶¶ 54–55. Small succumbed to his injuries while plaintiffs were at the precinct, and he was pronounced dead at the scene. *Id.* ¶¶ 40, 56.

After the shooting, NYPD sources initially provided false statements to the media "in order to cover up defendant Isaacs's misdeeds." *Id.* ¶¶ 59–65. When video "contradicting the NYPD's official account of the incident" was later released by the New York Post, the NYPD stripped Isaacs of his gun and badge. *Id.* ¶¶ 66–67, 69.

Plaintiffs filed this lawsuit on June 30, 2017, asserting constitutional and state-law claims against the City and Isaacs. *See* Compl., ECF No. 1. On December 14, 2017, their lawsuit was consolidated with *Small v. City of New York*, a wrongful death action brought against Isaacs and the City on behalf of Isaacs's estate ("the *Small* plaintiffs"). See Dec. 14, 2017 Order. On December 18, 2018, I granted the City's motion to dismiss the claims then brought against it as a municipal entity and employer after I concluded that Isaacs was not operating within the scope of his employment at the time of the shooting. *See Albert*, 2018 WL 5084824, at *9, *12. In their fourth amended complaint, plaintiffs assert the following claims against the City defendants: (1) denial of the right to familial association, (2) unreasonable seizure, (3) violations of the New York State Constitution, and (4) intentional infliction of emotional distress. *See* FAC ¶¶ 71–89.[3] Plaintiffs also argue that, pursuant to the doctrine of *respondeat superior*, the City can be held

---

[3] In their opposition motion, plaintiffs voluntarily withdrew three other claims against the City defendants: their Fifth Amendment, negligence, and negligent infliction of emotional distress claims. *See* Pls.' City Opp'n 8 n.4, 11 n.5.

liable for all state-law violations committed by its employees while they were acting within the scope of their employment. *See id.* ¶¶ 100–102. Against Isaacs, the plaintiffs assert the following state-law claims: (1) violations of the New York State constitution; (2) intentional infliction of emotional distress, (3) negligent infliction of emotional distress, and (4) negligence. *Id.* ¶¶ 83–85, 86–99. Isaacs and the City defendants have each moved to dismiss most of the claims against them.[4] For the reasons explained below, their motions are granted in part and denied in part. Specifically, the following claims survive the motions: plaintiffs' unreasonable seizure claim against the City defendants, Albert and Z.S.'s negligent infliction of emotional distress claim against Isaacs, and the claims brought under the New York State Constitution.[5] All other claims are dismissed.

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *County of Erie v. Colgan Air, Inc.*, 711 F.3d 147, 149 (2d Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). When reviewing a defendant's motion to dismiss, the court "must accept as true all of the factual allegations contained in the complaint." *Swierkiewicz v. Sorema N. A.*, 524 U.S. 506, 508 n.1 (2002). As long as the plaintiff alleges sufficient factual content to allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged," the motion will be denied. *Ashcroft*, 556 U.S. at 678. However, the court is not required to accept as true conclusory allegations or "formulaic

---

[4] Though the City defendants note in their moving papers that they "understand that Isaacs will be moving to dismiss the federal claims against him" in *Small v. City of New York*, Isaacs has not made such an application to the court, and there are no motions currently pending in that case before the court, *see* City Defs.' Br. 22.

[5] Curiously, defendants do not address the plaintiffs' New York state constitutional claims. As such, the court does not review the sufficiency of these claims, and they remain in this lawsuit along with the other claims that survive this motion to dismiss. *See, e.g.*, *Francis v. United States*, No. 3:10cv474 (AWT), 2011 WL 356146, at *7 (D. Conn. Aug. 12, 2011).

recitation[s] of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007). Likewise, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* A plaintiff must assert "specific facts or circumstances" in support of his claims; "[a] complaint which [is] . . . unsupported by factual assertions fails even the liberal pleading standard of Rule 12(b)(6)." *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996) (quoting *Palda v. Gen. Dynamics Corp.*, 47 F.3d 872, 875 (7th Cir. 1995)).

## DISCUSSION

### I.     Familial Association Claim

Plaintiffs assert a claim against Detective Scarlatelli, Lieutenant Zelikov, Sergeant Tavares, and Officer Corso for their alleged interference with plaintiffs' right to familial association. *See* FAC ¶¶ 71-76. They argue that the defendant officers violated their Fourteenth Amendment right to intimate association when they arrived at the scene of the shooting, intentionally separated plaintiffs from Small, and prevented plaintiffs "from aiding and comforting" Small during the final moments of his life. *Id.*; *see also id.* ¶¶ 50–53. Because I conclude that defendants' actions, as alleged in the complaint, were neither intentional nor so shocking, arbitrary, or egregious that they violated plaintiffs' substantive due process rights, this claim is dismissed.

In *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618–19 (1984), the Supreme Court recognized that the Constitution protects the right to intimate familial association. *See also Gorman v. Rensselaer County*, 910 F.3d 40, 47 (2d Cir. 2018) (citing *Patel v. Searles*, 305 F.3d 130, 135–36 (2d Cir. 2002)). This constitutional right, which the Second Circuit has located within the Fourteenth Amendment's right to substantive due process, *see, e.g.*, *Muselli v. Tuckahoe Union Free Sch. Dist.*, No. 17-CV-1913 (KMK), 2018 WL 4637003, at *4 (S.D.N.Y. Sept. 27, 2018), extends to "the right to be free from government attempts to undermine or interfere with family relationships." *Pizzuto v. County of Nassau*, 240 F. Supp. 2d 203, 209 (E.D.N.Y. 2002); *see also*

*Patel*, 305 F.3d at 135. As a general rule, family members have "a substantive right under the Due Process Clause 'to remain together without the coercive interference and awesome power of the state.'" *Anthony v. City of New York*, 339 F.3d 129, 142 (2d Cir. 2003) (quoting *Tenenbaum v. Williams*, 193 F.3d 581, 600 (2d Cir. 1999)). However, while the Second Circuit has suggested that even a temporary state-sanctioned interference with a family relationship could give rise to a violation under the Fourteenth Amendment, a plaintiff "must demonstrate that her separation from [her family member] was 'so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection.'" *Id.* (quoting *Tenenbaum*, 193 F.3d at 600). This is a difficult standard to meet, particularly because the Second Circuit recently clarified that impairment of the family relationship must have been the *intent* of the defendants—not merely an "indirect and incidental" consequence of their conduct. *Gorman*, 910 F.3d at 48. Where the defendants were motivated by other legitimate interests—rather than an intent to deprive the plaintiff of her rights to associate with her family members—such a claim cannot survive. *See, e.g.*, *Oglesby v. Eikszta*, No. 1:07-CV-00051 (NPM-RFT), 2011 WL 4442932, at *6 (N.D.N.Y. Sept. 22, 2011) (summarizing *Anthony* and *Tenenbaum* as holding that brief separations "do[] *not* give rise to the level of egregiousness necessary for a substantive due process violation, where the purpose of the separation was to ensure the physical well-being of the detained individual, which is a legitimate governmental objective" (citing *Anthony*, 339 F.3d at 143; *Tenenbaum*, 193 F.3d at 600–01)); *Pizzuto v. County of Nassau*, 240 F.2d 203, 210–13 (E.D.N.Y. 2002).

In announcing a right to intimate association, "*Roberts* established a sliding scale for determining the amount of constitutional protection an association deserves," with only the most intimate relationships receiving full constitutional protection. *Patel*, 305 F.3d at 136; *see also*

*Roberts*, 468 U.S. at 619 (extending the substantive due process right to family relationships that "attend the creation and sustenance of a family—marriage, childbirth, the raising and education of children, and cohabitation with one's relatives" (citations omitted)). The Second Circuit has "assumed, without deciding," that the right extends to half-siblings, *see Anthony*, 339 F.3d at 143 n.11, and has concluded that it encompasses the relationship between a parent and her children, *see Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir. 1977). I previously recognized that "Z.S., as Small's child, is the only plaintiff whose family connection has been found to be close enough to support this claim." *Albert*, 2018 WL 5084824, at *8 n.11. However, I did not decide as a matter of law that Albert and Z.I.—Small's live-in partner and her daughter, respectively—could *not* claim a substantive due process right to familial association with Small. Indeed, while the City defendants argue that Z.S., as Small's biological child, "is the only plaintiff who has standing to bring a familial association claim for the alleged conduct of the officers on the scene," City Defs.' Br. 6, ECF No. 74, they cite no cases where courts have considered and rejected relationships like Z.I.'s and Albert's in the context of a familial association claim, *see id.*; *see also* Pls.' City Opp'n 4–5, ECF No. 77. On the contrary, the right is far more nuanced, depending on a number of factors, including "cohabitation and the precise degree of kinship," as well as the relationship's "size, purpose, selectivity, and whether others are excluded from critical aspects of the relationship," *Maselli v. Tuckahoe Union Free Sch. Dist.*, No. 17-CV-1913 (KMK), 2018 WL 4637003, at *4 (S.D.N.Y. Sept. 27, 2018) (first quoting *Patel*, 305 F.3d at 136; then quoting *Bd of Directors of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 546 (1987)). Here, plaintiffs allege that all three plaintiffs lived "harmoniously and continuously" together for over three years, and that Albert and Small were co-parenting their son, Z.S., in the same household. *See* FAC ¶¶ 19–23. Particularly at this stage of the litigation, these allegations—at least as they pertain to the

relationship between Albert and Small—are sufficient to give rise to an inference of a relationship worthy of constitutional protection. *See also Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 58-59 (2d Cir. 2014) (concluding, in a case involving the First Amendment right to intimate association, that an unmarried couple engaged in a "bona fide betrothal" could assert a claim to intimate association).

Nevertheless, plaintiffs' complaint fails to state a claim for the violation of their familial association rights. Though plaintiffs allege, in a conclusory fashion, that the defendant officers "intentionally interfere[d] with [plaintiffs'] right of familial association with Mr. Small," FAC ¶ 53, their complaint is devoid of facts that would plausibly suggest that interference with the family relationship was anything other than an incidental consequence of defendants' actions. *See, e.g.*, *Gorman*, 910 F.3d at 48 (finding no violation where the impairment of the family relationship "was at best the indirect and incidental result of [defendants'] conduct"); *Shaw v. Stroud*, 13 F.3d 791, 805 (4th Cir. 1994) ("[T]he Supreme Court has never extended [the family association right] to encompass deprivations resulting from governmental actions affecting the family only incidentally . . . ."). Plaintiffs do not allege, for example, that they protested the defendants' conduct in the moment or asked the officers to allow them to remain by Small's side. Absent contemporaneous objections or any indication that they made their desire to remain with Small known to the officers, plaintiffs fail to plausibly plead that the officers had the specific intent to interfere with their familial association rights during the final moments of Small's life. *See Gorman*, 910 F.3d at 48. Indeed, as defendants note, plaintiffs appear to contradict their single conclusory allegation of intent by arguing in their opposition brief that the defendants' actual intent

in separating plaintiffs from Small was to "obtain information to support their false narrative about Mr. Small's murder." Pls.' City Opp'n 6; *see also* City Defs.' Reply 4, ECF No. 81.[6]

Relatedly, I cannot conclude that the defendants' actions—even if they were conducted with the specific intent required by *Gorman*—were sufficiently egregious to support a substantive due process claim. Plaintiffs allege that the officers arrived at the scene "[a]pproximately ten minutes after the shooting," at the same time that EMTs arrived to provide urgent medical treatment to Small. *See* FAC ¶ 49. Defendant officers interviewed both Isaacs and Albert, before separating Albert and her family from the scene and "physically prevent[ing]" them "from aiding and comforting Mr. Small." *Id.* ¶ 51. Plaintiffs' complaint describes a set of fast-moving responses to a tragic and deadly shooting. Within that context, defendants' actions, even if "'incorrect or ill-advised,' [are] insufficient to give rise to a substantive due process violation." *Uwadiegwu v. Dep't of Social Services of the County of Suffolk*, 91 F. Supp. 3d 391, 398 (E.D.N.Y. 2015) (quoting *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 275 (2d Cir. 2011)); *see also E.D. ex rel. V.D. v. Tuffarelli*, 692 F. Supp. 2d 347, 367 (S.D.N.Y. 2010) ("The interest in family integrity 'does not automatically override . . . sometimes competing' government interest[s] . . . ." (quoting *Kia P. v. McIntyre*, 235 F.3d 749, 758 (2d Cir. 2000)). Legitimate governmental interests—such as protecting the well-being of plaintiffs, including Z.S., a five-month-old infant—justified the brief and temporary separation alleged here. *See, e.g., Anthony*, 339 F.3d at 143. In retrospect, perhaps,

---

[6] Plaintiffs also argue that defendants' failure to remove Isaacs from the scene of the shooting further supports their claim that the separation was conducted for illegitimate reasons—in particular, to advance a false narrative about Small's death. *See* Pls.' City Opp'n 6. However, their complaint does not make any specific allegations about Isaacs's whereabouts after plaintiffs were removed from the scene, nor do plaintiffs explain how this fact—even if true—is relevant to the defendant officers' specific intent to interfere with plaintiffs' family relationships. *Cf. Bullock v. Gerould*, 338 F. Supp. 2d 446, 451 (W.D.N.Y. 2004) (holding that there is no substantive due process violation where "defendants acted wrongly, and for improper motives," if their actions are not "so egregious, so outrageous, that [they] may fairly be said to shock the contemporary conscience." (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 848 n.8 (1998)).

defendants could have provided plaintiffs with additional time to comfort Small in the final moments of his life; however, even if their actions can be characterized as "[c]ommon negligence," they are "categorically insufficient to shock the conscience." *Cox*, 654 F.3d at 276. Small's tragic death means that plaintiffs are now "without the companionship and support" of Small for the rest of their lives, FAC ¶ 57. In the moment, however, defendants' temporary separation of plaintiffs was limited and justified by the state's interest in protecting plaintiffs and assuring medical treatment to Small. These actions therefore do not "approach the kind of 'shocking, arbitrary, and egregious' interference the Second Circuit has associated with a constitutional violation," *Garten v. Hochman*, No. 08 Civ. 9425(PGG), 2010 WL 2465479, at *5 (S.D.N.Y. June 16, 2010); *see also Anthony*, 339 F.3d at 143 (holding that a temporary separation, "while undoubtedly difficult and upsetting for [plaintiffs]," was insufficient to support a substantive due process claim); *Laureano v. Goord*, No. 06 Civ. 7845(SHS)(RLE), 2007 WL 2826649, at *12 (S.D.N.Y. Aug. 31, 2007) (holding that a "collateral interference" with a family relationship does not give rise to a family separation claim). For these reasons, plaintiffs' claim for interference with their familial association rights is dismissed.

## II.     Fourth Amendment Seizure

Plaintiffs allege that they were subjected to an unreasonable seizure when they were transported to the police precinct and questioned separately about the events leading up to the shooting by Detectives Solomon and Perodin. *See* FAC ¶¶ 53–55, 77–82; *see also* Pls.' City Opp'n 8 & n.4 (explaining that plaintiffs voluntarily withdraw their Fifth Amendment claim but are pursuing a Fourth Amendment seizure claim).[7] I conclude that plaintiffs' complaint supports an

---

[7] Though plaintiffs allege that defendants Scarlatelli, Zelikov, Tavares, and Corso transported plaintiffs from the scene of the shooting to the precinct, their Fourth Amendment seizure claim is asserted only against Detectives Solomon and Perodin, who separated them and questioned them at the precinct. *See* FAC ¶¶ 53–55.

inference that a reasonable person in their circumstances "would have believed that he was not free to leave," *United States v. Mendenhall*, 446 U.S. 544, 554 (1980), and that such a seizure was unreasonable in the circumstances, thus stating a claim for a Fourth Amendment violation.

"The Fourth Amendment's requirement that searches be founded upon an objective justification governs all seizures of the person, 'including seizures that involve only a brief detention short of traditional arrest.'" *Id.* at 551 (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). A seizure occurs "when, by means of physical force or a show of authority, his freedom of movement is restrained." *Mendenhall*, 446 U.S. at 553. To determine whether a seizure occurred, the court must look to "all of the circumstances surrounding the incident," including "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* at 554. These circumstances are only "[e]xamples," however; the ultimate test is whether "a reasonable person would have believed that he was not free to leave," *id.* Even a short, involuntary stop of a person who is not suspected of a crime can constitute a seizure within the Fourth Amendment. *See Illinois v. Lidster*, 540 U.S. 419, 425–26 (2004); *Davis*, 8394 U.S. at 726–27 ("Nothing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed 'arrests' or 'investigatory detentions.'").

Here, plaintiffs allege that they were transported by several officers to the NYPD precinct, placed in separate rooms, and interviewed by two detectives. *See* FAC ¶¶ 53-55. Plaintiffs "were not at any time suspected of any crime or violation in connection with the incident," and Albert had already been questioned on the scene by the detective officers. *Id.* ¶¶ 52–54. Despite the fact that defendants had already obtained information about the shooting after they arrived on the scene,

defendants removed plaintiffs from their loved one, physically transported them to a new location for further "interrogation," and separated them from one another at the precinct. *Id.* Additionally, all of these events occurred while plaintiffs were in a particularly vulnerable state, having just witnessed Small's shooting. *Id.* ¶¶ 36–37. Finally, Z.I., a 14-year-old girl, was separated and questioned by the two detectives "outside the presence of her parents." *See, e.g.*, *Phillips v. County of Orange*, 894 F. Supp. 2d 345, 362–63 (S.D.N.Y. 2012) (citing cases for the principle that a reasonable child may perceive that she is not free to leave when she is "escorted . . . for questioning by three adults" outside the presence of a parent). Given the presence of multiple officers, the plaintiffs' physical transportation to a new location, and the chaotic and traumatic nature of the events preceding the seizure, I conclude that a reasonable person in these circumstances would have felt that she was not free to leave. Thus, though plaintiffs' complaint contains few allegations regarding the events at the precinct and the behavior of the officers, these allegations are sufficient to state a claim that plaintiffs were seized within the meaning of the Fourth Amendment.

In their briefs, the parties debate whether plaintiffs allege sufficient facts to support the inference that they were seized. *See* City Defs.' Br. 13–14; Pls.' City Opp'n 8–9; Defs.' Reply 6–8. They do not, however, address the second question of the Fourth Amendment analysis—whether a seizure, even if properly pleaded, was nonetheless reasonable in the circumstances. The Second Circuit has held that a brief, suspicion-less seizure may be reasonable in "limited circumstances." *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000). Though a warrantless arrest is unconstitutional if the arresting officers lacked probable cause, a seizure that falls short of an arrest can be constitutional as long as it survives a reasonableness balancing test.[8] "Consideration of the

---

[8] In *Dunaway v. New York*, the Supreme Court held that a seizure that is materially indistinguishable from an arrest—even if not so labeled—requires probable cause to be constitutional. 442 U.S. 200, 216 (1979). Here, plaintiffs allege that they were physically removed from the scene and transported to the police precinct for an undisclosed period of time. *See* FAC ¶¶ 53–55; *see also* Pls.' City Opp'n 9. Some courts

constitutionality of such seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Brown v. Texas*, 443 U.S. 47, 50–51 (1979); *see also Dunaway v. New York*, 442 U.S. 200, 209 (1979) ("[T]o determine the justification necessary to make [a] specifically limited intrusion 'reasonable' under the Fourth Amendment, the Court [must] balance[] the limited violation of individual privacy involved against the opposing interests in crime prevention and detection and in the police officer's safety." (quoting *Terry v. Ohio*, 392 U.S. 1, 22–27 (1968))). This reasonableness balancing test likewise applies to the seizure of potential *witnesses* to a crime, even if the seized person is not herself suspected of criminal activity. *See, e.g.*, *Lidster*, 540 U.S. at 425–28.

Based on the facts alleged in plaintiffs' complaint, I conclude that they have also stated a claim that their seizure was unreasonable. *See, e.g.*, *Maxwell v. County of San Diego*, 708 F.3d 1075, 1084 (9th Cir. 2013) (concluding that the lengthy seizure of witnesses to a crime was unreasonable because the crime had already been solved and there was no suspicion of criminal activity); *Walker v. City of Orem*, 451 F.3d 1139, 1148-49 (holding, in a factually similar case, that the seizure of family members of a police shooting victim was unreasonable where there were no "exigencies . . . present" that would "justify[] the lengthy detention . . . for investigative purposes"). With respect to the first and second prongs of the *Brown* balancing test, plaintiffs' complaint alleges that they were seized *after* the officers had already interviewed both Albert and

have held that "involuntary transportation to a police station or other custodial setting can be deemed a de facto arrest." *United States v. Wrensford*, 866 F.3d 76, 85 (3d Cir. 2017); *see also Centanni v. Eight Unknown Officers*, 15 F.3d 587, 591 (6th Cir. 1994) ("[R]emoval of a suspect from the scene of the stop generally marks the point at which the Fourth Amendment demands probable cause."). Plaintiffs do not argue that they were arrested, however, so I do not analyze their seizure through the lens of probable cause. Instead, I utilize the balancing test in *Brown v. Texas*, 443 U.S. 47, 50–51 (1979) to analyze the constitutionality of a seizure that falls short of an arrest.

Isaacs. *See* FAC ¶¶ 50–55. At the time of the seizure, then, defendants were well aware that Isaacs was responsible for shooting Small. *See id.* ¶¶ 47–48, 59–64. Thus, there were no exigencies that could have justified the seizure on the basis of public safety, as Small's shooter had been identified and plaintiffs had already provided information about the shooting to the defendant officers. *See Lincoln v. Barnes*, 855 F.3d 297, 304 (5th Cir. 2017); *Tenenbaum*, 193 F.3d at 605 (defining the exigency exception as "[t]he need to protect or preserve life or avoid serious injury" (quoting *Mincey v. Arizona*, 437 U.S. 385, 392 (1978))); *see also Maxwell*, 708 F.3d at 1084 ("[I]n the hierarchy of state interests justifying detention, the interest in detaining witnesses for information is of relatively low value."). Additionally, the intrusion here—transportation to a police station, separation, and questioning for an undisclosed period of time—is more severe than the brief roadblock stops that have been deemed reasonable in similar circumstances. *See, e.g.*, *Lidster*, 540 U.S. at 427–28 (holding that brief, suspicion-less stops were reasonable because they were short, on-the-spot, and thus "interfered only minimally with liberty of the sort the Fourth Amendment seeks to protect").

Defendants argue, in the alternative, that they are entitled to qualified immunity on plaintiffs' unreasonable seizure claim. *See* City Defs.' Br. 14–17; City Defs.' Reply 8–9. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). "To be clearly established, a right must be sufficiently clear 'that every reasonable official would [have understood] that what he is doing violates that right.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (internal quotation marks omitted) (alteration in original)). Although there need not be "a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional

question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (citations and quotation marks omitted). Because a motion to dismiss requires the court to interpret a plaintiffs' allegations in the light most favorable to plaintiffs, "addressing the defense of qualified immunity on a motion to dismiss generally is disfavored." *Hyde v. Arresting Officer Caputo*, No. 98 CV 6722(FB)(ASC), 2001 WL 521699, at *2 (E.D.N.Y. May 11, 2001).

Defendants' arguments in support of qualified immunity rest exclusively on their contention that there is no clearly established law that would support plaintiffs' arguments that they were seized. *See* City Defs.' Br. 14–17; City Defs.' Reply 8–9. As stated above, I disagree with defendants' arguments, and conclude that plaintiffs state a claim that they were seized within the Fourth Amendment. Likewise, I conclude that clearly established Supreme Court precedent demonstrates that witnesses to a crime may be seized within the meaning of the Fourth Amendment when they are stopped, even if the stop is brief and intended for an investigative purpose. *See Lidster*, 540 U.S. at 427–28; *Davis*, 394 U.S. at 727 n.6 (stating that it is a "settled principle that while the police have the right to request citizens to answer voluntary questions concerning unsolved crimes[,] they have no right to compel them to answer"); *see also Terry*, 392 U.S. at 17–20 (holding that a stop that falls short of an arrest can still constitute a seizure within the meaning of the Fourth Amendment). Thus, contrary to defendants' argument that there is no clearly established law "holding that questioning of a witness not under arrest or suspected of any crime . . . could violate the Fourth . . . Amendment," City Defs.' Br. 17, there is ample Supreme Court case law—dating back to *Terry*, and reinforced by *Lidster*—that demonstrates that even a brief seizure must be analyzed under the Fourth Amendment.

Defendants do not argue that there is an absence of clearly established law holding that a seizure in these circumstances—even if properly pleaded—would be unreasonable. *Id.* Because

qualified immunity is an affirmative defense, defendants bear the burden of establishing that their conduct "did not violate clearly established law." *Rosu v. City of New York*, No. 11 Civ. 5437(DAB), 2012 WL 6582534, at \*7 (S.D.N.Y. Dec. 13, 2012); *Webster v. Moquin*, 175 F. Supp. 2d 315, 325 (D. Conn. 2001) ("[T]he defendants bear the 'burden of demonstrating the nonexistence of a clearly established right.'" (quoting *Tellier v. Fields*, 280 F.3d 69, 84 (2d Cir. 2000). Here, defendants fail to meet this burden, and they are thus not entitled to qualified immunity at this stage of the litigation.

To be sure, there are "few cases discussing the reasonability of detaining witnesses solely for investigative purposes." *Maxwell*, 708 F.3d at 1083. Still, there are several settled principles, announced and repeated by the Supreme Court, that emphasize that the seizure of a witness who is not suspected of a crime must be minimally intrusive and justified by legitimate interests in order to survive a constitutional challenge. *See Davis*, 394 U.S. at 726 (holding that investigatory seizures must be reasonable under the Fourth Amendment); *id.* at 727 n.6 ("[P]olice . . . have no right to compel [citizens] to answer" questions about "unsolved crimes."). *Lidster*, 540 U.S. at 427–28 (upholding a very short, on-the-spot investigative stop because it "interfered only minimally with liberty of the sort the Fourth Amendment seeks to protect"); *see also Maxwell*, 708 F.3d at 1084 ("[B]y focusing on the traffic stop's minimal intrusion on personal liberty, *Lidster* confirmed that the state interests justifying investigative witness detentions are lower than those justifying detention of suspected criminals."). All of the events alleged in plaintiffs' lawsuit took place in 2016, well after *Lidster* was decided in 2004. I thus conclude that *Lidster*—which built upon other cases to establish that witnesses to a crime may be detained only if the detention is brief and minimally-intrusive—put the defendants here "on notice that they could not detain, separate,

and interrogate" plaintiffs, *Maxwell*, 708 F.3d at 1084—especially absent exigency and in a location removed from the scene of the crime.

Drawing all reasonable inferences in favor of plaintiffs, I cannot conclude as a matter of law that defendants are entitled to qualified immunity on this claim, and plaintiffs' unreasonable seizure claim therefore survives defendants' motion to dismiss.

### III.     Intentional Infliction of Emotional Distress

Plaintiffs allege that the City defendants and Isaacs both subjected them to intentional infliction of emotional distress (IIED) in violation of their state common law rights. "To maintain a claim of IIED under New York law, the plaintiffs must establish '(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress.'" *Sylvester v. City of New York*, 385 F. Supp. 2d 431, 441 (S.D.N.Y. 2005) (quoting *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996)).

With respect to the City defendants, plaintiffs allege that they were subjected to intentional infliction of emotional distress when the defendant officers separated plaintiffs from Small during the final moments of his life. *See* FAC ¶¶ 88–89. For largely the same reasons that I dismissed plaintiffs' familial association claim, I conclude that plaintiffs fail to allege that defendants' actions were sufficiently extreme and outrageous to support their IIED claim. To state an IIED claim, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Howell v. N.Y. Post Co.*, 612 N.E.2d 699, 702-03 (N.Y. 1993) (quoting *Murphy v. Am. Home Prods. Corp.*, 448 N.E.2d 86, 90 (N.Y. 1983)). Here, defendants' conduct was justified by legitimate interests—including the protection of plaintiffs' well-being. *See supra* Part I. Moreover, even if, as plaintiffs suggest, defendants acted with the improper motivation of covering up Isaacs's misdeeds, "motivation, no matter how reprehensible" does not itself give rise to an

IIED claim, *Burba v. Rochester Gas & Elec. Corp.*, 456 N.Y.S.2d 578, 579 (App. Div. 1982). Therefore, I grant the City defendants' motion to dismiss plaintiffs' IIED claim against them.

Likewise, I conclude that plaintiffs fail to state an IIED claim against Isaacs. Plaintiffs allege that Isaacs's shooting of Small was intended to cause plaintiffs "severe mental and emotional distress." *See* FAC ¶ 87. They allege that Isaacs "made eye contact with the passengers in Mr. Small's car" before the shooting, and that he "was aware of [Small's] familial relationship with plaintiffs." *Id.* ¶¶ 29, 34. These allegations are insufficient to give rise to a reasonable inference that Isaacs either intentionally or recklessly caused plaintiffs severe emotional distress. "[C]onclusory statements, or 'the mere incantation of intent or state of mind'" is insufficient to give rise to an IIED claim." *Tesoriero v. Syosset Cent. Sch. Dist.*, 382 F. Supp. 2d 387, 403 (E.D.N.Y. 2005). The fact that Isaacs made eye contact with plaintiffs before the shooting does not plausibly support the conclusion that he shot Small with the *intent* to cause plaintiffs emotional distress. Nor does plaintiffs' allegation that Isaacs was aware of their family relationship with Small demonstrate that Isaacs shot Small with the intent to cause his family members emotional harm. *See, e.g.*, *Dunahoo v. Hewlett-Packard Co.*, No. 11 CV 05588(BSJ)(HBP), 2012 WL 178332, at *4 (S.D.N.Y. Jan. 20, 2012). These allegations are insufficient to give rise to the inference that Isaacs acted with intent towards plaintiffs, and thus, plaintiffs' IIED claim against Isaacs is dismissed.

## IV. Negligent Infliction of Emotional Distress

Plaintiffs also assert a claim for negligent infliction of emotional distress (NIED) against Isaacs, arguing that they suffered severe emotional damages when Isaacs shot Small. *See* FAC ¶¶ 95–99. There are two ways to state a claim for negligent infliction of emotional distress: first, by alleging that the defendant breached a duty owed to plaintiffs that "unreasonably endangered [their] safety," and second, by alleging that defendant's negligence threatened the plaintiffs with

physical harm, "and, as a result, [plaintiffs] suffered emotional injury from witnessing the death or serious bodily injury of an immediate family member." *Hiralall v. Sentosacare, LLC*, No. 13-cv-4437 (GBD), 2016 WL 1126530, 2016 U.S. Dist. LEXIS 35781, at *46 (S.D.N.Y. Mar. 18, 2016). Plaintiffs argue that their complaint states a claim for NIED against Isaacs under both theories of liability. *See* Pls.' Isaacs Opp'n 2-9, ECF No. 76.

The first type of liability, known as the "direct duty" theory, requires plaintiffs to show that the defendant owed a duty that was "specific to the plaintiff, and not some amorphous, free-floating duty to society." *Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996). It is not sufficient to demonstrate that the defendants had a "generalized duty to prevent unreasonable risks of harm to passers-by"; the duty owed by the defendant must have been "specific [and] unique" to plaintiffs. *Id.*; *see also Hazan v. City of New York*, No. 98 Civ. 1716(LAP), 1999 WL 493352, at *5 (S.D.N.Y. July 12, 1999) (holding that the City's "general duty to prevent its police force from inflicting unreasonable harm on society at large" was insufficient to state an NIED claim under a direct duty theory). Here, plaintiffs allege that Isaacs "owed plaintiffs a duty of care to be free from reasonable apprehension of bodily harm or injury." FAC ¶ 96. As in *Mortise*, however, this is nothing more than a generalized duty to the public at-large—not a duty that is targeted and particularized. *See* 102 F.3d at 694–96 (holding that defendants did not owe a direct duty to plaintiffs, even though they were aware of plaintiffs' presence near the scene of the defendants' "mock 'wargames'"). Plaintiffs argue that *Doe v. Doe*, No. 16 Civ. 0332 (NSR), 2017 U.S. Dist. LEXIS 109692, at *23–24 (S.D.N.Y. July 14, 2017), demonstrates that the duty need not be owed *specifically* to plaintiff as long as it was owed to "a targeted group of individuals within a population." Plaintiffs, however, fail to identify how they were a member of a "targeted group"—on the contrary, they argue that

Isaacs owed them a duty because they were members of the public who happened to be near the shooting. This is insufficient to establish liability for NIED under the direct duty theory.

Nevertheless, I do find that Albert and Z.S. state a claim for NIED under the bystander theory of liability. Under this theory, a plaintiff who "is himself or herself threatened with bodily harm in consequence of the defendant's negligence [can] recover for emotional distress resulting from viewing the death or serious physical injury of a member of his or her immediate family." *Bovsun v. Sanperi*, 461 N.E.2d 843, 847 (N.Y. 1984). This theory "has been applied in cases involving shootings by police officers." *Sylvester*, 385 F. Supp. 2d at 445; *see also id.* (holding that the fact that a shooting was intentional "does not preclude actions by bystanders based on negligence towards them"). The parties dispute every element of this claim, but, at this stage of the litigation, I find that plaintiffs allege sufficient facts to state a claim for bystander liability on behalf of Z.S. and Albert.

First, Isaacs argues that Albert and Z.I. do not meet the definition of "immediate family" as envisioned by the New York Court of Appeals in *Bovsun. See* Isaacs's Br. 3–5, ECF No. 73. In *Bovsun*, the court expressly declined to define "the outer limits of 'the immediate family,'" but held that the plaintiffs in that case—who were "married or related in the first degree of consanguinity to the injured or deceased person"—qualified as immediate family members. *Bovsun*, 461 N.E.2d at 850 n.13. Later, in *Trombetta v. Conkling*, the court held that the relationship between an aunt and her adult niece did not meet the definition of "immediate family," even where the pair "lived close by and enjoyed many activities together on a daily basis." 626 N.E.2d 653, 654 (N.Y. 1993). The court cautioned that "public policy" prohibited courts from creating an NIED cause of action for "all bystanders who may be able to demonstrate a blood relationship coupled with significant emotional attachment," but it did not define the specific

contours of a relationship that would give rise to such a claim. *Id.* In a persuasive Southern District case cited by plaintiffs, however, the court concluded that the relationship between an aunt and her young nephew—which was akin to the relationship between a mother and her son—*did* give rise to an NIED claim. *Sullivan v. Ford Motor Co.*, No. 97CIV 0593 (RCC), 2000 U.S. Dist. LEXIS 4114, at *33–35 (S.D.N.Y. Mar. 31, 2000). The court distinguished *Trombetta*, arguing that the facts alleged in that case demonstrated that the adult niece did not "rel[y] on her aunt for her everyday needs, as a child relies on a parent." *Id.* at *33. In contrast, in *Sullivan*, the parties presented a set of "unique circumstances," demonstrating that the relationship between the aunt and her young nephew was indistinguishable in all material respects from the relationship between a "sole legal and physical custodian and *de facto* parent." *Id.* at *35. The court warned against the danger of an alternative ruling, which would risk "work[ing] a potential injustice" by "foreclos[ing] plaintiff from making a claim based upon emotional harm because her relationship with the injured person does not carry a particular label." *Id.* at *36 (quoting *Pieters v. B-Right Trucking, Inc.*, 669 F. Supp. 1463, 1471 (N.D. Ind. 1987)).[9]

Plaintiffs provide few allegations about Z.I.'s relationship with Small. At best, they allege that Z.I., Albert's fourteen-year-old daughter, lived with Small, *see* FAC ¶ 22, but they present no facts that would suggest that Z.I. had a relationship with Small that was similar to the relationship between a parent and a young child. *Cf. Sullivan*, 2000 U.S. Dist. LEXIS 4114, at *35. I cannot conclude from these facts that Z.I. was Small's "immediate family member," and I therefore dismiss Z.I.'s claim for negligent infliction of emotional distress.

---

[9] Plaintiffs cite to New York state statutes in a variety of unrelated contexts, including criminal law and employment benefits, which define "immediate family" to include domestic partners. *See* Pls.' Isaacs Opp'n 4-5, ECF No. 76. These statues are of limited value to the question presented here, because they do not involve tort liability. They do, however, demonstrate the ways that the nature of "family" has evolved over time—particularly since the New York Court of Appeals last spoke on this issue in 1993.

On the other hand, I find that plaintiffs allege sufficient facts to support the inference that Albert was Small's immediate family member. Plaintiffs' complaint contains facts that collectively suggest that Albert and Small were living together in a *de facto* marriage. They allege that they had been living "harmoniously and continuously" for several years, that they were co-parenting a young child together, and that they were so close that Albert, along with Small's blood relatives, "made the arrangements for Mr. Small's funeral." FAC ¶¶ 20–23, 70. Isaacs cites *Santana v. Salmeron*, 79 A.D.3d 1122 (N.Y. App. Div. 2010), to support his argument that a "girlfriend" is not an immediate family member, *id.* at 1123 (concluding that a girlfriend was not an immediate family member, but providing no information about the nature of the relationship in that case). Plaintiffs' complaint, however, presents Albert as more than simply Small's girlfriend; she was closer to a spouse—a long-term partner sharing the responsibilities and obligations of child-raising. I find that these facts are distinguishable from those in *Trombetta* and *Santana*, and closer to the facts presented in *Sullivan*. As a result, mindful of prematurely foreclosing a valid claim of emotional harm, I conclude that plaintiffs' allegations are sufficient to state a claim that Albert was Small's immediate family member.

Both parties agree that Z.S., as Small's biological child, was Small's immediate family member, but Isaacs argues that Z.S. was not old enough to have suffered emotional distress as a direct result of the shooting. Isaacs's Br. 5–6. "Another required element of a claim for negligent infliction of emotional distress is the plaintiff's contemporaneous observation of serious physical injury or death of a member of his or her immediate family, while in the plaintiff's presence." *Steinsnyder v. United States*, No. 09-CV-5407 (KAM), 2013 U.S. Dist. LEXIS 45945, at *33–35 (E.D.N.Y. Feb. 8, 2013). Z.S. was only five months old at the time of the shooting, making it unlikely that he was able to contemporaneously observe the shooting and suffer emotional injury

as a proximate cause of Isaacs's conduct. However, because I cannot conclude as a matter of law that Z.S. did not suffer emotional injury as a direct consequence of his observation of the shooting, I deny Isaacs's motion to dismiss on this basis. *Cf. Stamm v. PHH Vehicle Mgmt. Servs., LLC*, 32 A.D.3d 784, 787 (N.Y. App. Div. 2006) (dismissing, on summary judgment, a 16-month-old's NIED claim after concluding that the record failed to demonstrate that he had an "independent recollection of the accident").

Finally, Isaacs argues that plaintiffs fail to state an NIED bystander claim because they do not allege that they were within the "zone of danger" at the time of Small's shooting. *See* Isaacs's Br. 6–7. To be in the "zone of danger," the plaintiff must have been exposed to "an unreasonable risk of bodily injury or death." *Erony v. Alza Corp.*, 913 F. Supp. 195, 201 (S.D.N.Y. 1995). A plaintiff who encounters an injured family member *after* a traumatic incident was not herself exposed to physical harm, and therefore was not in the zone of danger. *Id.* Likewise, a plaintiff who observed an injury to a loved one but was safely removed from the harm posed by defendants' conduct was not in the zone of danger. *See Steinsnyder*, 2013 WL 1209099, at *3.

Here, plaintiffs allege that they were "approximately seven feet away" from Isaacs's car at the time of the shooting, allowing them to watch, "in a clear and unobstructed view" as Isaacs fatally shot Small. FAC ¶ 36. They also allege that Isaacs shot Small as Small approached Isaacs's car, which was "approximately one lane away" from his own car. *Id.* ¶¶ 32, 35. Drawing all inferences in favor of plaintiffs, plaintiffs state a claim that Isaacs was pointing his gun in the direction of plaintiffs' car, since that is the location from which Small had, just moments before, exited his vehicle to "approach[]" Isaacs's car. *Id.*[10] Given the unique harms posed by shootings—

---

[10] Plaintiffs also allege that Albert immediately climbed into the driver's seat of Small's car and "drove approximately two blocks" away from the shooting, lending further credence to her argument that she felt imminently physically endangered by Isaacs's actions. *See* FAC ¶ 37.

which courts have found sufficient to justify an NIED claim, *see Sylvester*, 385 F. Supp. 2d at 445; *Lubecki v. City of New York*, 304 A.D.2d 224, 238 (N.Y. App. Div. 2003)—I conclude that plaintiffs state a claim that they were in the zone of danger. As a result, I deny Isaacs's motion to dismiss Albert's and Z.S.'s NIED claims.

## V. Negligence

Finally, plaintiffs assert a claim for negligence against Isaacs, alleging that Isaacs breached his duty to prevent plaintiffs from suffering "reasonable apprehension of bodily harm or injury." FAC ¶ 91. A negligence claim is distinct from an NIED claim. *See Ewing v. Roslyn High Sch.*, No. 05-CV-1276(JS)(ARL), 2009 WL 10705995, at *6 (E.D.N.Y. Mar. 31, 2009). In order to sustain a negligence claim, a plaintiff must allege that she "suffered a physical injury as a result of the [defendant's] action or inaction." *Dzwonczyk v. Syracuse City Police Dep't*, 710 F. Supp. 2d 248, 278 (N.D.N.Y. 2008). Plaintiffs' complaint alleges only emotional injuries; it does not suggest that plaintiffs suffered any physical injuries as a result of Isaacs's conduct. Therefore, plaintiffs' allegations are insufficient to support their negligence claim, and the claim is dismissed. *See Ewing*, 2009 WL 10705995, at *6 ("[W]here a plaintiff suffers only emotional or mental injury and there is no pain and suffering stemming from a physical injury or condition, the plaintiff's cause of action is for negligent infliction of emotional harm and not for pure negligence.").

## CONCLUSION

For the foregoing reasons, the defendants' motions are granted in part and denied in part. The following claims remain in this lawsuit: (1) plaintiffs' unreasonable seizure claim against Detectives Solomon and Perodin, (2) Albert's and Z.S.'s negligent infliction of emotional distress

claim against Isaacs, and (3) plaintiffs' claims for violations of the New York state constitution.[11]
All other claims are dismissed.


SO ORDERED.

Date:  August 13, 2019                                             _____/s/_____
         Brooklyn, New York                                       Allyne R. Ross

---

[11] Because I conclude that these motions were best resolved on the papers submitted by the parties, I deny plaintiffs' request for oral argument. Likewise, I deny plaintiffs' request for leave to amend because plaintiffs have amended their complaint several times, and any further amendments would be futile. *See Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003).